IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| MARSHA GRAY, | CASE NO. 1:21-cv-881 |
| Plaintiff, | DISTRICT JUDGE |
| | DAN AARON POLSTER |
| vs. | |
| | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | JAMES E. GRIMES JR. |
| Defendant. | **REPORT &** |
| | **RECOMMENDATION** |

Plaintiff Marsha Gray filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Disability Insurance Benefits and Supplemental Security Income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court reverse the Commissioner's decision and remand for proceedings consistent with this opinion.

**Procedural history**

In September 2019, Gray filed applications for Disability Insurance Benefits and Supplemental Security Income alleging a disability onset date of November 25, 2016, and claiming she was disabled due to learning disability, PTSD, depression, severe cocaine and opioid use disorder, high blood pressure,

and asthma.[1] Tr. 174, 181, 218. The Social Security Administration denied Gray's applications and her motion for reconsideration. Tr. 62-63, 84-85. Gray then requested a hearing before an Administrative Law Judge (ALJ). Tr. 131.

In September 2020, an ALJ held a hearing. Gray and a vocational expert testified. Tr. 34-60. Later that month, the ALJ issued a written decision finding that Gray was not disabled. Tr. 15-29. The ALJ's decision became final on March 13, 2021, when the Social Security Appeals Council declined further review. Tr. 1-3; *see* 20 C.F.R. § 404.981.

Gray filed this action on April 28, 2021. Doc. No. 1. She asserts the following assignment of error:

> The ALJ erred when he did not find Plaintiff disabled at Step 3 of the sequential evaluation.

Doc. No. 11, p. 13.

**Evidence**

*1.  Personal and vocational evidence*

Gray was born in 1973 and was 43 years old on the alleged disability onset date. Tr. 27. She completed seventh grade and previously worked in food service, a factory, and as a babysitter. Tr. 22, 26.

---

[1] "Once a finding of disability is made, the ALJ must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

2.    *Medical evidence*[2]

In March 2016, Gray saw Mitchell Wax, Ph.D., for a consultative exam. Tr. 279. Gray said that she was unable to work because it was hard for her to get along with people and she often thought that people were out to get her. Tr. 280. Every day, Gray spoke to her sister and adult son. Tr. 280. Every day, she went to a drug treatment center for methadone. Tr. 280. Gray's sister took her shopping once a month and Gray's friend took her to the drug treatment center. Tr. 281. Gray had no interests or hobbies and watched a lot of television. Tr. 281. People from a local church helped Gray, although Gray did not attend church. Tr. 281. Gray stated that she had panic attacks and she can't be around a lot of people. Tr. 281.

Dr. Wax wrote that Gray was "emotionally labile" and "highly agitated" during the interview. Tr. 282, 284. Dr. Wax commented that Gray was difficult to interview and deteriorated as the evaluation progressed. Tr. 283. Gray became confused and paranoid and had difficulty concentrating and keeping her eyes open. Tr. 283. She appeared suspicious. Tr. 283. Because Dr. Wax was unable to complete intellectual function tests, the results were invalid. Tr. 282-283. Dr. Wax diagnosed Gray with psychotic disorder and polysubstance dependence. Tr. 283. He found that, due to her psychotic disorder, Gray could not understand, remember, or carry out instructions; maintain attention and

---

[2] The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs.

concentration on a job; respond appropriately to supervisors and coworkers; or respond appropriately to work pressures in a work setting. Tr. 284. Dr. Wax explained that Gray reported that she doesn't like being told what to do, she's anxious when she leaves her house, and she can't concentrate when she's anxious. Tr. 284. He wrote that Gray's difficulty concentrating during the examination "appeared to be more than just due to being anxious." Tr. 284.

In August 2016, a Disability Investigations Unit investigated Gray for allegations of fraud. Tr. 319. The report noted areas of conflict between the medical evidence of record and Gray's presentation and statements about her alleged limitations. Tr. 319. The Unit contacted Gray's sister, who said that she saw Gray every day and that Gray has poor social skills—she cries, yells, screams, and has panic attacks. Tr. 321.

In February 2019, Gray was referred to the Cleveland Municipal Court Psychiatric Clinic for a violence risk assessment after a petty theft conviction. Tr. 348. She saw Megan Testa, M.D. Tr. 348-355. Gray recounted her background: she moved from school to school and was between home and foster placements. Tr. 349. At school, Gray had an Individualized Education Program, did not made it past seventh grade, and stopped going to school when she was 15. Tr. 349. She held many jobs over the years but they didn't last more than a few months because she can't get along with others—"it's my attitude." Tr. 350. Gray said that she "'felt terrible' emotionally" for many years. Tr. 351 Since childhood, she's had a depressed mood, insomnia, and

mood swings. Tr. 351. She also can't trust others. Tr. 351. "[Gray] turned to drugs and alcohol habitually because she could not bear to feel the painful emotions that she was experiencing." Tr. 351.

Gray said that she had recurrent flashbacks, intrusive thoughts, nightmares of past traumas, and chronic insomnia. Tr. 351. According to Dr. Testa's report, Gray couldn't fall asleep at night because she felt "on edge, unsafe, and hyper alert, …. always looking around her" and constantly checking her surroundings. Tr. 351. Gray had persistent anger, rapid mood swings, and rages. Tr. 351. She felt detached and irritable and she couldn't concentrate. Tr. 351. Gray reported years of depression "accompanied by loss of interest[] in enjoyable activities," poor energy and appetite, and feelings of hopelessness and worthlessness. Tr. 351. Dr. Testa recommended evaluation and treatment for possible post-traumatic stress disorder (PTSD). Tr. 354.

In May 2019, Gray went to the Matt Talbot for Women center for inpatient drug treatment and therapy. Tr. 360, 373. Initially, Gray minimally participated in group sessions, but her participation gradually improved as she became acclimated to the treatment environment and her peers. Tr. 360. She struggled with unresolved anger and getting along with others, often initiating conflict due to her inability to communicate effectively. Tr. 360. Gray's PTSD symptoms appeared to contribute to Gray's communication issues. Tr. 360. With therapy, Gray "increase[d] awareness of her cognitive distortions and communication," but she resisted completing "thought sheets" and "never fully

developed the anger management skills necessary to help with this issue." Tr. 360. She had an "incident with a peer" that led to her early discharge in July 2019. Tr. 360. In her individual therapy sessions she openly participated and developed coping skills to manage her anxiety and depression. Tr. 360.

Meanwhile, as part of her therapy, Gray visited Catholic Charities. Tr. 364. In an exam in June 2019, Gray had a depressed mood, a congruent and restricted affect, a linear thought process, intact and "circumferential" associations, no delusions or hallucinations, normal behavior and speech, fair insight, and fair to good judgment. Tr. 364-365. In July 2019, Gray was living at home again and attending three substance abuse meetings a week. Tr. 367. She was taking medication. Tr. 367. Upon exam, Gray appeared well-kept, she had normal behavior and speech, an "up and down" mood, a euthymic affect,[3] a linear thought process, intact associations, and good insight and judgment. Tr. 368. The doctor increased Gray's trazadone dosage because Gray was waking up at night. Tr. 368. The doctor assessed Gray with PTSD and unspecified depression. Tr. 368.

In August 2019, Gray had a diagnostic evaluation at Ohio Guidestone. Tr. 372. Gray's depressive symptoms included thoughts of death, low mood, difficulty concentrating, anhedonia, fatigue, and lack of motivation. Tr. 372. Gray reported nightmares, intrusive thoughts, hyper vigilance, and

---

[3] A euthymic affect is tranquil, neither depressed nor manic. *See, e.g.,* Dorland's Illustrated Medical Dictionary 655 (32d ed. 2012).

6

restlessness. Tr. 372. During the exam, Gray had a neat appearance; normal speech, eye contact, motor activity, and attention; a euthymic mood and a full affect; no cognition or memory impairments; cooperative behavior; and fair insight and judgment. Tr. 375-376. Gray was diagnosed with major depressive disorder and PTSD. Tr. 383.

In September 2019, Gray returned to Ohio Guidestone. Tr. 393. During the exam, Gray was distractable and anxious. Tr. 394. In November, Gray visited Ohio Guidestone and reported that she struggled with concentration, focus, and getting along with others. Tr. 484. She identified her support system as therapists, a friend, and her sisters. Tr. 484.

In December 2019, Gray saw Jorethia Chuck, Ph.D., for a consultative exam. Tr. 408. Gray described her childhood in foster care, a group home, and living with her mother. Tr. 409. She stated that she had a good relationship with her siblings and her adult son. Tr. 409. Gray was in treatment for drug abuse and had not abused drugs during the ten months before the exam. Tr. 409. She reported that because she was not using drugs, "all of the bad stuff is coming back to her." Tr. 410. Gray felt depressed all the time, which made her feel like all she wanted to do was lie down. Tr. 410.  She had crying spells and stayed in her house because she felt irritated. Tr. 410. She felt "like something is going to happen if I go outside." Tr. 410. Gray had been hearing voices, but her medication resolved that problem. Tr. 410. She had trouble sleeping at night, but she could sleep during the day. Tr. 410. Gray could dress, bathe, and

groom herself; cook; and do laundry, household chores, and her own shopping. Tr. 410. She could "handle money." Tr. 411. Gray last worked for a temp agency at a factory putting coupons into boxes and she got along with her coworkers and her supervisor. Tr. 410. She rode the bus and got a ride to her appointment with Dr. Chuck. Tr. 410.

Dr. Chuck stated that Gray appeared tense at the start of the interview but appeared to relax as the conversation progressed. Tr. 411. Gray was cooperative and intelligible and had adequate language skills and good eye contact. Tr. 411. Her affect was flat and her mood seemed depressed. Tr. 411. Her insight and judgment were good. Tr. 412. Gray "did not appear to lose concentration" and Dr. Chuck estimated Gray's cognitive functioning to be in the low average range. Tr. 411. Dr. Chuck diagnosed major depressive disorder, recurrent, with psychotic features; PTSD; and opioid use disorder, moderate, in early remission. Tr. 412. Dr. Chuck opined that Gray's depression affected her ability to function on a daily basis and she would have problems remembering and carrying out instructions. Tr. 413. Gray's depression would limit her ability to maintain attention and concentration and she would have difficulty carrying out tasks that require her to maintain persistence and pace. Tr. 413. Gray should be able to respond appropriately to supervision, and her mental ability to withstand the stress and pressure of daily work activity would be impaired. Tr. 413.

In January 2020, Gray had a video appointment with a nurse at Ohio Guidestone and reported having run out of her medication one month before her appointment. Tr. 489. Gray's sleep medication had helped her, but without it she had problems sleeping. Tr. 489. Gray's depressive symptoms had worsened and she had low energy and motivation. Tr. 489.

In April 2020, Gray contacted Ohio Guidestone and said she had been having suicidal thoughts. Tr. 483. She had stopped taking her medication and hadn't attended a therapy appointment for almost two months. Tr. 483. Gray was advised to go to the emergency room, but she responded that she was fearful of hospital settings due to the Covid-19 pandemic. Tr. 483. Gray felt safe at home with her family—"they know her emotional state" and they watch her closely and don't leave her alone. Tr. 483.

### 3.    State agency opinions[4]

In December 2019, David Dietz, Ph.D., reviewed Gray's record and found that her impairments did not satisfy a listed impairment.[5] Tr. 67. Dr.

---

[4]    When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[5]    The "listings" are found at 20 C.F.R. Part 404, Subpart P, App. 1. They are a catalog of disabling impairments organized by "body systems." Generally, each *body system* section has an *Introduction*, which contains information

Dietz opined that Gray had moderate limitations in understanding, remembering, or applying information; interacting with others; concentrating, persisting and maintaining pace; and adapting and managing oneself. Tr. 67-68. For her mental residual functional capacity (RFC),[6] Dr. Dietz found that Gray can have occasional superficial interaction with others and can adapt to minor and infrequent day-to-day changes in a work setting. Tr. 71.

In May 2020, Paul Tangeman, Ph.D., adopted Dr. Dietz's findings. Tr. 98, 102.

### 4. *Hearing testimony*

Gray, who was represented by counsel, testified at the administrative hearing held in September 2020. Gray stated that she goes back and forth between living with her son and living with a friend. Tr. 40. She has a driver's license and can drive, but she doesn't have a car. Tr. 41. She doesn't take public transportation because she's scared to get on a bus. Tr. 41. She doesn't like being around people and she has panic attacks when they crowd around her. Tr. 41. Gray's son drives her places. Tr. 41.

---

relevant to that system, and a *Category of Impairments*, which contains each numbered listing. Each listing describes the objective medical and other findings needed to satisfy the criteria of that listing. *Id*.; 20 C.F.R. § 404.1525.

[6]    An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec*., 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec*., 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

Gray last worked for a temp agency in 2019 for about a month, putting coupons into boxes. Tr. 43-44. Gray worked with about ten people and got into arguments with them. Tr. 44-45. She was told she has a bad attitude and "I need to go work on it." Tr. 44. She was fired because she didn't get along with people and also because the agency didn't need her anymore. Tr. 44. Before that job, Gray and another woman babysat for 5 or 6 children. Tr. 45.

When asked why she applied for disability, Gray answered that she is depressed. Tr. 47. Gray said she can't deal with people and she doesn't like going outside. Tr. 47. She has panic attacks—she takes medication to help but it wasn't working. Tr. 47. Gray has problems focusing when working and she gets off task. Tr. 48. She spends her time watching TV. Tr. 48. She cooks for herself. Tr. 51. Gray's son has three young children. Tr. 50. When Gray sometimes feels that she has to get away from them, she goes to her friend's house. Tr. 50. Because she thinks about killing herself, Gray's son doesn't want her to be alone. Tr. 51. Those thoughts have gotten worse since she stopped using drugs. Tr. 52. Gray's son gave her a pill box to help her remember to take her medications. Tr. 51.

Gray described her other depressive symptoms: she stays indoors, she doesn't like to be bothered, and sometimes she can't eat. Tr. 52. Gray's sleep medication helped at first but was no longer helping. Tr. 52. When Gray wakes up during the night, she checks the windows and doors. Tr. 52. During the day she has low energy—her medication helped but her energy level was still low.

11

Tr. 53. Gray is easily angered and has one friend who doesn't get mad at her because the friend understands why Gray acts the way she does. Tr. 53-54. Gray also hears voices. Tr. 55. Gray's medication helps with the voices but she still hears them. Tr. 55.

The ALJ discussed with the vocational expert Gray's past relevant work as a babysitter. Tr. 56. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Gray could perform her past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below.[7] Tr. 57. The vocational expert answered that such an individual could not perform Gray's past work but could perform the following representative jobs in the economy: linen room attendant; laundry worker; and box vender. Tr. 57-58.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2021.

2. The claimant has not engaged in substantial gainful activity since November 25, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

---

[7]     A vocational expert's testimony "is directed solely to whether, given a claimant's age, experience, and education, along with the ALJ's assessment of what she 'can and cannot do,' there exist a significant number of employment opportunities for her in the regional and national economies." *Webb*, 368 F.3d at 633. The vocational expert considers the claimant's RFC, "'age, education, and work experience' and assesses whether the claimant 'can make an adjustment to other work.'" *Id*. (quoting 20 C.F.R. § 416.920(a)(4)(v)).

3. The claimant has the following severe impairments: depressive disorders, PTSD, substance addiction disorders (drugs), and psychotic disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: She can understand, remember, carry out, and complete simple, routine tasks with no strict production rate pace requirements. She can engage[] in occasional and superficial interactions with supervisors, coworkers, and the public. Superficial is defined as no arbitration, negotiation, confrontation, mediation, or being responsible for the safety or supervision of others. She can adapt to only occasional and routine workplace changes.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born [i]n 1973 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from November 25, 2016, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 17–28.

### Standard for Disability

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

14

> 5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

A court may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

## Discussion

Gray argues that the ALJ erred when he analyzed the evidence and concluded that Gray did not satisfy the criteria of Listing 12.04, *Depressive, bipolar and related disorders*. Doc. No. 11, p. 3.

At step three of the disability evaluation process, a claimant will be found disabled if his or her impairments meet or equal one of the listings in the Listing of Impairments. 20 C.F.R. § 404.1520(a)(4)(iii). The claimant bears the burden of establishing that any condition meets or equals a listing. *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 727-728 (6th Cir. 2004) (citing *Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)). A claimant "must present specific medical findings that satisfy the various tests listed in the description of the applicable impairment or present medical evidence which

describes how the impairment has such equivalency." *Id*. at 728 (citing *Evans v. Sec'y of Health & Human Servs*., 820 F.2d 161, 164 (6th Cir. 1987)). "Each listing specifies the objective medical and other findings needed to satisfy the criteria of that listing" and a claimant "must satisfy all the criteria to 'meet' the listing." *Reynolds v. Comm'r of Soc. Sec*., 424 F. App'x 411, 414 (6th Cir. 2011). "[A] claimant is also disabled if her impairment is the *medical equivalent* of a listing[.]" *Id*. (emphasis in original). There is no heightened articulation standard at Step Three. *Bledsoe v. Barnhart*, 165 F. App'x 408, 411 (6th Cir. 2006).

Listing 12.04 contains three paragraphs—*A, B*, and *C*. To satisfy Listing 12.04, a claimant must meet or equal the requirements in *paragraphs A* and *B* or *paragraphs A* and *C. See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1, 12.00A2. The ALJ found that Gray did not satisfy *paragraphs B* or *C*. Gray asserts that the ALJ did not discuss *paragraph A*, and the ALJ's finding that she did not satisfy the *paragraph B* criteria was not supported by substantial evidence. Doc. No. 11, pp. 5-7.

The ALJ did not discuss *paragraph A* and Defendant does not dispute Gray's assertion that she satisfies the *paragraph A* criteria. Doc. No. 11, p. 5. So whether Gray prevails hinges on whether the ALJ's *paragraph B* finding is supported by substantial evidence. The ALJ's *paragraph B* finding is not supported by substantial evidence.

To satisfy the *paragraph B* criteria, the claimant must have:

B. Extreme limitation of one, or marked limitation of two, of the following areas of mental functioning (see 12.00F):

> 1. Understand, remember, or apply information (see 12.00E1).
> 2. Interact with others (see 12.00E2).
> 3. Concentrate, persist, or maintain pace (see 12.00E3).
> 4. Adapt or manage oneself (see 12.00E4).

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.04 (2018).[8] The ALJ found that Gray had "moderate" limitations in all four areas. Tr. 19-20. Gray argues that she has "marked" limitations in two areas—interacting with others and concentration, persistence, and pace—and that the ALJ's contrary finding is unsupported by substantial evidence. Doc. No. 11, p. 5.

### 2.    *Interacting with others*

The regulations describe *Interacting with others*:

This area of mental functioning refers to the abilities to relate to and work with supervisors, co-workers, and the public. Examples include: cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness. These examples illustrate the nature of this area of mental functioning. We do not require documentation of all of the examples.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00E2. In his decision, the ALJ wrote:

In interacting with others, the claimant has a moderate limitation. The claimant reported she does not have friends but tries to make friends and often becomes nervous when talking with others (Ex. B7F/9). She

---

[8]    This version of Listing 12.04 was in effect at the time of the ALJ's September 2020 decision. The 12.00 subsections are the definitions for the relevant words and phrases each citation follows.

> described a good relationship with her adult child, and she is able to leave the home unaccompanied, shop in stores, and ride the bus (Ex. B9F/3-5). The claimant noted to have good eye contact and normal, fluent speech on examination (Ex. B5F/6, B6F/8, 11, B7F/5, B9F/5, B10F/3, 8, B12F/8, 13, 18, B14F/4, 10, 15, 26). Therefore, I find that the claimant has moderate limitation in the ability to relate to and interact with others.

Tr. 19.

Gray argues that the ALJ's reasoning is flawed. She submits, "Having a good relationship with a child does not equate to no significant limitations in other social situations, particularly in the work setting." Doc. No. 11, p. 6. Gray contends that she consistently reported that she fears leaving her house alone, she testified that she has trouble riding the bus, and, she asserts, "Being able to shop does not indicate anything about one's social functioning, nor does good eye contact and fluent speech." Doc. No. 11, p. 6. Defendant maintains that the ALJ's findings are reasonable. Doc. No. 14, p. 5.

While the evidence cited by the ALJ could, in some instances, be sufficient evidence to support a *moderate* finding in the area *Interacting with others*, that evidence is not sufficient in this case. Gray's ability to have a good relationship with her adult son is not relevant to her ability to interact with others in a work setting. This is so because the record shows that Gray had significant problems interacting with others outside her family. Her therapist wrote that she struggled with unresolved anger and getting along with others in her group therapy sessions. Tr. 360. Gray was discharged from therapy three days early "to avoid a further disruption in the treatment community" after

she had an "incident with a peer." Tr. 360. The ALJ did not address that fact. While Gray performed better in her individual therapy sessions, Tr. 360, her ability to interact one-on-one with a therapist, and have good eye contact and normal speech, says little about her ability to interact with others in a group setting like a work environment.

Gray also reported being fired from work because she didn't get along with others. Tr. 43-45, 350. Although there was conflicting evidence in the record regarding her experience working with others,[9] the ALJ did not reconcile this evidence. It is the ALJ's duty, not the court's duty, to resolve conflicts in evidence. *Garner*, 745 F.2d at 387; *see Floyd v. Finch*, 441 F.2d 73, 75 (6th Cir. 1971).

While the ALJ stated elsewhere in his decision that Gray's depressive symptoms improved with medication, the ALJ did not assess whether Gray's ability to interact with others improved with medication. Tr. 23. On this record, it is unclear whether or to what extent Gray's depression is related to her inability to interact with others.[10] So the ALJ's decision, when read as a whole, does not cure the deficiency in the ALJ's step-three assessment. Gray has thus shown that the ALJ's *Interacting with others* reasoning is not supported by substantial evidence, and she has identified evidence in the record that

---

[9]     *See* Tr. 410 (Gray's exam with Dr. Chuck).

[10]    The ALJ also found that Gray had the following severe impairments: PTSD, substance addiction disorders, and psychotic disorder. Tr. 18.

supports a determination that her limitation in this area of functioning is more than *moderate*.

> 2.     *Concentration, persistence, and pace*

The regulations describe *Concentration, persistence, and pace*:

> This area of mental functioning refers to the abilities to focus attention on work activities and stay on task at a sustained rate. Examples include: Initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day. These examples illustrate the nature of this area of mental functioning. We do not require documentation of all of the examples.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00E3.

The ALJ found that Gray had a *moderate* limitation and wrote, "One examiner noted the claimant was easily distracted; however, during a psychological consultative evaluation, she did not appear to lose concentration." Tr. 19 (citing the evaluations of Dr. Testa and Dr. Chuck). Dr. Testa, who evaluated Gray at the municipal court psychiatric clinic, commented that Gray's concentration was marginal and that her attention was fair, "but she was easily distracted and startled by noises in the hall or people walking by out of her direct view." Tr. 352. Dr. Chuck remarked that Gray did not appear to lose concentration or to be distracted by internal stimuli. Tr. 411. Those two observations are not mutually exclusive. Dr. Testa's observation is relevant to whether Gray can ignore or avoid distractions while in a work

21

environment, but the ALJ didn't explain how he assessed that evidence. The ALJ also cited Gray's ability to manage her personal care, cook, do laundry and household chores, handle finances, and shop in stores. Tr. 19. Those tasks don't implicate Gray's ability to ignore or avoid distractions while performing in a work environment, either. *See* § 12.00E3. Gray has thus shown that the ALJ's *Concentration, persistence, and pace* reasoning is not supported by substantial evidence, and that there is evidence in the record that supports a more than *moderate* limitation in this area of functioning.

Because the ALJ did not discuss the *paragraph A* criteria and the ALJ's evaluation of the *paragraph B* criteria is not supported by substantial evidence, I recommend that the ALJ's decision be remanded for further consideration of whether Gray's impairments satisfy Listing 12.04.

**Conclusion**

For the reasons explained above, I recommend that Defendant's motion for summary judgment be denied, and the Commissioner's decision be reversed and remanded for proceedings consistent with this opinion.

Date: September 30, 2022

*/s/ James E. Grimes Jr.*

James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).